**Entered on Docket
November 16, 2005**

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: ) | |
| ) | BK-S-05-10775-LBR |
| NORTH AMERICAN DEED COMPANY, ) | |
| INC., ) | |
| ) | |
|          Debtor. ) | |
| ) | Chapter 11 |
| ) | |
| _____ ) | |
| NORTH AMERICAN DEED COMPANY, ) | |
| INC., ) | Adv. Proceeding No.: 05-1173-BAM |
| ) | |
|          Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Date:   October 5, 2005 |
| JON A. JOSEPH, and J. SCOTT ) | Time:  9:30 a.m. |
| MACDONALD, ) | |
| ) | |
|          Defendants. ) | |
| _____ ) | |

**OPINION ON MOTION FOR DISQUALIFICATION**

      North American Deed Company, the debtor in this case (NADC), believes that it never should have filed for bankruptcy. It blames its filing on its former general counsel, Jon A. Joseph (Joseph) and its former president, J. Scott MacDonald (MacDonald), and in this proceeding has sued them alleging a breach of their fiduciary duties to NADC, as well as the receipt of sundry preferences and unauthorized postpetition transfers. In addition, NADC has also alleged that

Joseph, while employed by NADC, committed legal malpractice and engaged in the unauthorized practice of law to NADC's detriment.[1]

Joseph and MacDonald answered NADC's complaint through their attorneys, Gordon & Silver, Ltd. This representation bothers NADC, since Gordon & Silver represented NADC from NADC's inception in early 2002 through mid-2003. NADC contends that it is improper for its fired general counsel (Joseph) to hire NADC's former general counsel (Gordon & Silver). It has moved to disqualify Gordon & Silver from representing Joseph and MacDonald.

## I. GOVERNING LAW AND THE STANDARD TO BE APPLIED

The District of Nevada requires each "attorney admitted to practice . . . to adhere to the standards of conduct prescribed by the Model Rules of Professional Conduct as adopted and amended from time to time by the Supreme Court of Nevada, except as such may be modified by this court." Local Rule IA 10-7. The parties contend that Nevada Supreme Court Rule 159 applies here.[2]

---

[1] Joseph was apparently not licensed in Nevada during the relevant times, having let his membership lapse. He was, however, apparently a member of the California bar during the times relevant for this motion.

[2] The court agrees that Rule 159 applies to the extent that the focus is on lawyers still employed by Gordon & Silver. With respect to work done for NADC by lawyers no longer with Gordon & Silver, the court believes the issue is covered by Rule 160 because the individual attorneys now representing Joseph and MacDonald did not previously represent NADC. Under Rule 160, attorneys in a firm who did not previously represent a particular client are disqualified by imputation if a current or previously associated attorney would be disqualified from representing the client under Rule 159. Both Rule 159 and Rule 160, however, have the same core requirement – that the two representations be substantially related – and thus a primary focus on Rule 159 does not materially alter the analysis or the result.

Nonetheless, the court is not constrained to consult only Nevada Supreme Court Rules. As permitted by Local Rule IA 10-7, the court may consider other relevant authorities, such as the *Restatement (Third) of the Law Governing Lawyers*, the actual Model Rules and related commentaries. As noted in the *Restatement:* "With respect to bankruptcy, there is substantial disagreement whether . . . general conflict-of-interest rules should be changed in some instances. Tribunals must resolve such questions in light of a body of decisions developed in the specific context of bankruptcy, and often the issues are controlled by statute." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 128,

2

Nevada Supreme Court Rule 159 adopts the essence of Rule 1.9(a) of the American Bar Association's Model Rules of Professional Conduct. The relevant part of Rule 159 provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> 1. Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents, preferably in writing, after consultation . . . .[3]

This rule, as well as Rule 1.9(a), requires disqualification if the two representations – the representation of the former client and the proposed representation of the new client – are substantially related. The Nevada Supreme Court has recently adopted a three-part test for

---

cmt. c(ii) (2000). *See also* Nancy Rapoport, *The Intractable Problem of Bankruptcy Ethics: Square Peg, Round Hole*, 30 HOFSTRA L. REV. 977 (2002); John D. Ayer, *How To Think About Bankruptcy Ethics*, 60 AM. BANKR. L.J. 355 (1986).

[3] As set forth in the *Restatement (Third) of the Law Governing Lawyers*,

> The rule . . . accommodates four policies. First, absent the rule, a lawyer's incentive to serve a present client might cause the lawyer to compromise the lawyer's continuing duties to the former client (see § 33). Specifically, the lawyer might use confidential information of the former client contrary to that client's interest and in violation of § 60. The second policy consideration is the converse of the first. The lawyer's obligations to the former client might constrain the lawyer in representing the present client effectively, for example, by limiting the questions the lawyer could ask the former client in testimony. Third, at the time the lawyer represented the former client, the lawyer should have no incentive to lay the basis for subsequent representation against that client, such as by drafting provisions in a contract that could later be construed against the former client. Fourth, and pointing the other way, because much law practice is transactional, clients often retain lawyers for service only on specific cases or issues. A rule that would transform each engagement into a lifetime commitment would make lawyers reluctant to take new, relatively modest matters.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 132, cmt. b (2000).

determining when two matters are "substantially related" as contemplated in this rule.[4] Waid v. Eighth Judicial District Court, 119 P.3d 1219 (Nev. 2005). Under this test, the court must:

> (1) make a factual determination concerning the scope of the former representation, (2) evaluate whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters, and (3) determine whether that information is relevant to the issues raised in the present litigation.

*Id*. at 1223.

## II. THE SCOPE OF THE PRIOR REPRESENTATION

As to *Waid's* first point, the scope of the former representation, the court has the benefit of the record as developed at the time of the hearing, and as supplemented by post-hearing submissions, under seal, from both Gordon & Silver and from NADC. These submissions show that Gordon & Silver was engaged as NADC's counsel in a wide range of problems for NADC, most of which involved corporate counseling and the management of litigation for NADC and for its officers.[5]

After review of the time sheets, declarations, agreement drafts, emails and other assorted detritus of the Gordon & Silver/NADC/Romano representation that the parties have

---

[4]The origins of the substantially related test are in Judge Weinfeld's opinion in T. C. Theatre Corp. v. Warner Bros. Pictures, 113 F. Supp. 265 (S.D.N.Y. 1953), *aff'd*, 216 F.2d 290 (2d Cir. 1954), in which Judge Weinfeld held that an attorney who had represented a film distributor on appeal against a government antitrust claim could not properly represent a movie theater operator in pending private antitrust litigation against the film distributor. In disqualifying the attorney, Judge Weinfeld held that the distributor did not have to prove the transmission and retention of confidential communications. As Judge Weinfeld stated, "The former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client." *Id*. at 268.

[5]Gordon & Silver represented not only NADC, but also at least one of its officers and directors, Aaron Romano, against whom Joseph and MacDonald have filed a counterclaim in this litigation. Romano has joined NADC in objecting to Gordon & Silver's representation of Joseph and MacDonald.

4

submitted,[6] the following emerges as a background for the type of information that passed between NADC, as client, and Gordon & Silver, as its counsel:

- Gordon & Silver managed significant nascent litigation for NADC involving Mary K. Rivers (Rivers). This representation involved advice to NADC and negotiating with Rivers' attorney on the effect of a possible NADC bankruptcy on Rivers' claim; indeed, there was discussion among the parties and internally at Gordon & Silver regarding the effect of Archer v. Warner, 538 U.S. 314 (2003), then a new and significant Supreme Court case touching on the issues of concern to Rivers. When he was hired in 2003, Joseph stepped directly into Gordon & Silver's role in this dispute. At least one attorney who worked on this matter is still affiliated with Gordon & Silver, although that attorney is apparently not involved in the current representation of Joseph and MacDonald.
- Gordon & Silver's time records indicate that it gave advice to NADC about the unauthorized practice of law, and prepared at least two memorandums on the subject. The time records are unclear as to the exact scope of the advice. but it was more than minimal. Gordon & Silver's lawyers and professionals billed at least sixteen hours to this topic over five months.[7] The professionals associated with this work, however, are no longer affiliated with Gordon & Silver.
- Until Joseph was hired, Gordon & Silver managed most, if not all, of NADC's legal business. NADC hired another firm for some intellectual property work, but for the most part the time records indicate that Gordon & Silver did

---

[6] At the time of the hearing, Gordon & Silver maintained that it could not locate NADC's client files. In its post-hearing submissions, Gordon & Silver said it had found the file. It then provided portions of the file with its post-hearing declarations, and volunteered to provide the entire file should the court require.

[7] This amount of time does not count advice given regarding lawyer solicitation, which appears to have been billed separately.

5

significant legal work for NADC on a wide array of matters, including litigation management, labor law, and corporate structuring and restructuring. The total billings for all work by Gordon & Silver was approximately $28,200, representing about 150 hours of service. Except for litigation matters, most of the lawyers who rendered these services are also no longer with Gordon & Silver.

Many of the communications provided to establish the above relationships were to nonclients, and thus cannot be considered confidential. The scope of all these communications, however, was such that, in any normal attorney-client relationship, there would have been significant confidential communications exchanged before the communications were released publicly. For example, the Rivers litigation involved some bankruptcy strategy – the public documents indicate the parties dickered over the effect of a then-recent United States Supreme Court ruling. It would be odd if Gordon & Silver's attorneys did not discuss this new case with NADC and its officers before taking a position on it with other attorneys. It also would be odd if NADC did not believe that such preliminary discussions were confidential.

### III. THE SIGNIFICANCE OF THE FACT THAT MANY ATTORNEYS WHO GAVE NADC ADVICE ARE NO LONGER AFFILIATED WITH GORDON & SILVER

The review above indicates that lawyers and other professionals who are no longer affiliated with Gordon & Silver performed much of the work that could be related to the issues in the present lawsuit. At oral argument, counsel seemed to accept that this absence removed the scope of the work done by the departed professionals from the disqualification analysis. It doesn't. Nevada Supreme Court Rule 160(3), which mirrors Rule 1.10(b) of the Model Rules of Professional Responsibility, provides that:

> 3. When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially

6

adverse to those of a client represented by the formerly associated lawyer unless:

    (a) The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

    (b) Any lawyer remaining in the firm has information protected by Rules 156[8] and 159(2) that is material to the matter.

These rules incorporate the same "substantially related" test found in Nevada Supreme Court Rule 159 and Model Rule 1.9. *See* Coles v. Arizona Charlies, 992 F. Supp. 1214 (D. Nev. 1998). That is, even if the attorney responsible for the potentially disqualifying representation has left the firm, the firm is nonetheless still disqualified if the prior matter is substantially related to the lawsuit at issue. *Id.* at 1216 ("Thus, . . . once a magistrate judge or a court has determined that the representations are 'substantially related' and the interests of the clients are 'materially adverse,' disqualification of the formerly associated lawyer is warranted under Rules 159 *and* 160.") (emphasis supplied).[9]

    This imputation may be harsh, but it is not surprising. As noted in a leading treatise:

    Usually, when a lawyer who has been actively serving a client leaves a firm, either a cohort or a supervisory attorney remaining in the firm will have knowledge of the affected client's matters. The old firm will lose the disability only if the departing attorney played a completely lone hand with

---

[8] Rule 156(1) provides in part that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation . . . ."

[9] In *Arizona Charlies*, a different part of Rule 160 was at issue. The facts there were converse to those here, and implicated Nevada Supreme Court Rule 160(2); disqualification was sought in *Arizona Charlies* based on the fact that the plaintiffs' attorney had left a firm and then sued one of his previous firm's clients on issues that were substantially related to the lawsuit he had filed. Nonetheless, Rule 160(2) as construed in *Arizona Charlies* contains the relevant phrase "substantially related." The court believes that this phrase should be consistently construed in Rules 159, 160(2) and 160(3).

7

a client or took with him all of the lawyers who had worked on that client's affairs.

GEOFFREY C. HAZARD & W. WILLIAM HODES, THE LAW OF LAWYERING § 14.12, at pp. 14-36 to 14-37 (3d ed. 2005).

Here, the case is not close. Although the lawyers who left were the professionals primarily responsible for NADC's representation, they left behind at least one and possibly more lawyers who actively worked on NADC matters, including at least one matter — the Rivers litigation — that NADC claims is a significant part of its lawsuit. In addition, now that Gordon & Silver has located NADC's client file, it bears the burden of showing that it does not possess confidential client information. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 124(2), cmt. c(i) (2000) (firm opposing disqualification bears burden on at least three issues, including "that the firm does not now possess or have access to sources of client confidential information, particularly client documents or files . . . ."). They have not met this burden.

As a result, the scope of the prior representations remains relevant, even though some of the attorneys who were primarily responsible for that advice are no longer affiliated with the firm.

### IV. THE RELATIONSHIP BETWEEN THE PRIOR REPRESENTATION AND THE ISSUES RAISED IN THIS LAWSUIT

A.    *Waid's Second Factor*

After canvassing the prior representation, Rule 159 and Rule 1.9(a), and by inference Rule 160 and Rule 1.10, require the court to "evaluate whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters . . . ." *Waid*, 119 P.3d at 1223. In this inquiry, "a realistic appraisal of whether confidences might have been disclosed in the prior matter . . . ." *Id*. at 1222, *quoting* Robbins v. Gillock, 109 Nev. 1015, 1018, 862 P.2d 1195, 1197 (Nev. 1993).

The description of services and Gordon & Silver's role demonstrate that it is likely that Gordon & Silver and NADC exchanged confidential information of the type contemplated by *Waid*.

8

Gordon & Silver essentially was NADC's general counsel, advising a start-up business on a wide array of subjects, some of which presented novel legal issues. Among these issues was NADC's ability to perform its services without violating rules regarding the unauthorized practice of law. Gordon & Silver's advice at such an early stage of NADC's corporate life, especially when NADC was developing proprietary and possibly significant intellectual property essential to its business, confirms that the probability is quite high that confidential information passed between NADC and Gordon & Silver, thus satisfying the second *Waid* factor.[10]

### B. *Waid's Third Factor*

The third inquiry required by *Waid* is to "determine whether that [confidential] information is relevant to the issues raised in the present litigation." *Waid*, 119 P.3d at 1223. As recognized by the Nevada Supreme Court, NADC bears the burden of showing the relevance, and that "[a] superficial similarity between the two matters is not sufficient to warrant disqualification." *Id*. The *Restatement of the Law Governing Lawyers* describes this inquiry as one of determining whether the new representation presents a substantial risk to the former client, and states that, "[s]ubstantial risk exists where it is reasonable to conclude that it would materially advance the client's position in the subsequent matter to use confidential information obtained in the prior representation." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 132, com. d(iii) (2000).

---

[10] With respect to information imputed to Gordon & Silver that was held or given to those lawyers and professionals who no longer practice with the firm, Rule 160(3)(b) requires disqualification if "[a]ny lawyer remaining in the firm has information protected by Rules 156 and 159(2) that is material to the [new] matter." As to this point, now that NADC's file has been found, it undoubtedly contains at least some of the conclusions and advice given to NADC on corporate restructuring and the unauthorized practice of law, two topics upon which the present Gordon & Silver lawyers did not give advice; the time sheets indicate that memorandums were written on these topics, especially the unauthorized practice of law. These communications would appear to satisfy the Rule 160(3)(b) element, although there is sufficient evidence with respect to the Rivers matter to disqualify Gordon & Silver under Rule 160 and Rule 1.10(a).

9

With respect to some of the causes of action alleged in NADC's complaint, the remoteness of Gordon & Silver's representation from the issues in the present litigation is apparent. The preference and postpetition transfer claims for relief, if pursued in isolation, would present no issue of relatedness. Not only are they distant in time, but they are not the type of bankruptcy issues upon which advice was apparently given.

But NADC has not pursued the bankruptcy avoidance actions in isolation. The complaint joins these bankruptcy-based claims for relief with significant common law claims regarding legal malpractice and the unauthorized practice of law. A fair reading of NADC's complaint indicates that resolution of this case undoubtedly will involve examination of the proper scope of law-related work by one not formally licensed to practice law. It is not much of a stretch to conclude that similar advice – such as what could and could not be done by NADC and its agents without a licence to practice law – was the subject of the prior memorandums and counseling.[11]

In addition, Gordon & Silver gave bankruptcy advice with respect to the Rivers lawsuit, which NADC indicates will be a major part of its legal malpractice claim. Especially with respect to the Rivers lawsuit, the advice Gordon & Silver gave to NADC is not only substantially related to the gravamen of the current lawsuit, it is directly related, and it is quite likely that confidential communications about this subject passed between Gordon & Silver and NADC. To preserve public confidence in the legal profession and the trust to be accorded to attorney-client communications, "the presumption that the lawyer *did* learn what he could (reasonably) have learned in the first representation is an irrebuttable one." HAZARD & HODES, *supra* § 13.5, at p. 13-16 (emphasis in original). In this context, the court finds that the facts satisfy *Waid's* third factor as

---

[11]NADC's complaint contains a separate count for the unauthorized practice of law. Without passing as to whether that count states a viable cause of action, *see* Jordan v. State *ex rel.* Dept. of Motor Vehicles and Public Safety, 110 P.3d 30, 51 & n.78 (Nev. 2005), the court assumes that the activities that cause of action encompasses, at least for purposes of this motion, are well within the bounds of the legal malpractice claim for relief.

10

well.  Therefore, the attorneys originally representing NADC would be disqualified under Rule 159, and that disqualification is imputed to Gordon & Silver under Rule 160(1).

        C.    *The Indirect Holding of Confidential Information: "Playbook" Conflicts*

There is another aspect of relatedness here that confirms the above analysis.  As adumbrated by NADC, the legal malpractice claims have the potential to be far reaching, and conceivably could extend to advice on corporate structuring (and since Gordon & Silver represented some NADC insiders, it likely gave some advice in that area).  The breadth of NADC's claims is matched by the scope of Gordon & Silver's prior representation; as the primary if not the sole outside counsel, Gordon & Silver either set or put in motion much of the legal apparatus that Joseph inherited, and then modified or carried on.  In short, Gordon & Silver can be presumed to have given, and can be held to retain, significant information about the decisions made regarding the formation of NADC and about how its officers and directors participated in that formation.  Indeed, it is difficult to think of a law firm that would have more comprehensive information about the inner workings of NADC at the time that Joseph was hired.

Almost forty years ago, the Ninth Circuit found that possession of such comprehensive information can raise serious concerns if the lawyer with such information sues his or her former client.  In Chugach Elec. Ass'n v. United States District Court, 370 F.2d 441 (9th Cir. 1966), *cert. denied*, 389 U.S. 820 (1967), the Ninth Circuit disqualified a former general counsel from representing entities suing his former employer, even though "an actual conflict of interest is not clearly established and from a study of the record we are satisfied of [counsel's] good faith in resisting disqualification." *Id.* at 442.

*Chugach* involved an antitrust suit by a bankruptcy trustee.  The trustee had chosen as his counsel the former inside general counsel of the defendant.  *Id*. at 442-43.  In reversing the trial court's denial of a disqualification motion brought by the former employer, the court noted:

> The problem here is not limited to the question whether [counsel] was connected with [the former employer] as its counsel at the time agreements

11

> were reached and overt acts taken, but includes the question whether, as attorney, he was in a position to acquire knowledge casting light on the purpose of later acts and agreement. The policies of the new board majority, pursuant to which the alleged violations occurred, presumably reflected the expressed views and attitudes of the old minority.

*Id.* at 443.

At issue in *Chugach* were alleged anticompetitive agreements negotiated and signed while the trustee's lawyer was an in-house general counsel to the defendant. The Ninth Circuit noted that proof that these contracts violated antitrust laws involved "views and attitudes . . . [that are] not likely to expressed in open meeting or public debate . . . ." *Id.* As the court saw it, "[a] likelihood here exists which cannot be disregarded that [counsel's] knowledge of private matters gained in confidence would provide him with greater insight and understanding of the significance of subsequent events . . . and offer a promising source of discovery." *Id.*

The facts in this case raise the same concerns as noted in *Chugach*. Gordon & Silver represented NADC during its formative stages, and that representation involved issues such as the Rivers litigation that would dog NADC when it later filed for bankruptcy. Other novel issues were undoubtedly discussed, especially given Gordon & Silver's representation of individual NADC officers and members of NADC's board. It undoubtedly gained a view from "private matters" that would give it insight into some of the transactions that have been identified as forming part of the legal malpractice claims.

Some solace for Gordon & Silver might be gained from the Ninth Circuit's later statements in Unified Sewerage Agency v. Jelco Inc., 646 F.2d 1339 (9th Cir. 1981).[12] The court

---

[12] The American Bar Association apparently takes a dim view of *Chugach*. *See* AM. BAR ASS'N, FORMAL ETHICS OPIN. 99-415, at 7 n.16 (1999) (characterizing *Chugach* as overbroad in its treatment of prior, unrelated, information as the basis for disqualification). Nevertheless, *Chugach* is binding circuit authority.

there dealt with a lawyer who had represented a general contractor with respect to the proper interpretation of a general contract, who then turned around and sued the same client for breach of a subcontract that related to the general contract. The court stated:

> As the findings of fact indicate, Kobin & Meyer [the law firm in both matters] did not have access to any specific information that would help Teeples & Thatcher prevail against Jelco [the former client] (other than general information concerning the personality of a client, which is always helpful in later suits against that client). Jelco, fully advised by its regular counsel, was in a position to know all the risks it was taking in employing Kobin & Meyer.
>
> We find no facts that suggest that Kobin & Meyer would be tempted to "soft pedal" the rights of one client in these cases so as not to jeopardize the position of another client. Nothing suggests that Kobin & Meyer had an incentive not to represent zealously the interests of each client in their respective cases.

*Id.* at 1351-52.

A more expansive reading of *Jelco*, however, indicates that there is no solace to be found. In *Jelco*, the lower court had found that Jelco's management knew about the potential conflicts when it hired Kobin & Meyer. "Jelco's management, with full knowledge of Jelco's potential conflict with Teeples & Thatcher on the same project, and with full knowledge of Kobin & Meyer's long-standing relationship with Teeples & Thatcher, retained Kobin & Meyer." *Id*. at 1343. This was tantamount to consent.

In the present case, however, NADC was offered no such choice, and indeed, when asked, refused to consent. Joseph and MacDonald selected Gordon & Silver at a time when the legitimate management of NADC could not participate in the decision, and NADC has timely objected. And there is, especially in the matters of the unauthorized practice of law and the Rivers

13

litigation, some question as to whether Gordon & Silver received confidential information beyond the "personality of the client" that would aid them in their defense of Joseph and MacDonald.

Despite significant criticism of its holding,[13] some courts have built upon *Chugach*, and have indicated that "substantial relatedness" can be established through a showing of extensive knowledge of a client's operations and strategy. *See* SLC Limited V v. Bradford Group West, 999 F.2d 464, 467-68 (10th Cir. 1993) (finding that disqualifying information could be found when lawyer for secured creditor had represented debtor's general partner; court found that "confidential information regarding the financial positions of various guarantors and Loran, the general partner, as well as Loran's negotiating strategies and its capacity to settle its outstanding indebtedness" could form the basis of a finding that the various matters were substantially related); Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 626 F.2d 1020, 1031-32 (5th Cir. 1981) (recognizing concept, but finding that facts did not justify application of theory); Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 235-36 (2d Cir. 1977) (recognizing concept, and discussing it in the context of whether the matters were substantially related); Guzewicz v. Eberle, 953 F.Supp. 108, 112-14 (E.D. Pa. 1997) (applying *Maritrans*, *infra*, but finding facts before court did not justify disqualification); State *ex rel.* Ogden Newspapers, Inc. v. Wilkes, 211 W.Va. 423, 566 S.E.2d 560 (W.Va. 2002) (recognizing playbook concept, but finding that facts did not justify its application); Reason v. Wilson Concrete Prod., Inc., 119 Ohio Misc. 2d 94, 774 N.E.2d 784 (Ohio C.P. 2002) (recognizing concept in disqualifying law firm); Maritrans GP, Inc. v. Pepper Hamilton & Sheetz, 529 Pa. 241, 602 A.2d 1277 (1992) (allowing action for injunctive relief to proceed for violations of rules of professional conduct based on general representation of client and later suing same client in the general area in which advice was given).[14] *Cf.* NCK Org. Ltd. v. Bregman, 542 F.2d 128 (2d Cir.

---

[13]See note 12, *supra*.

[14]In *Maritrans*, the court had evidence before it that "the type of information that Pepper and Messina possess about Maritrans is of the type considered to be confidential commercial information in the industry and that they would not reveal that information about their companies to their

14

1976) (disqualifying former inside legal counsel from representing former employee against corporation with respect to contract rights under contract lawyer had drafted for corporation; holding abuse of actual confidences not required); Robbins v. Gillock, 109 Nev. 1015, 1017-18, 862 P.2d 1195, 1997 (Nev. 1993) (finding former-client representation of doctor in factually unrelated medical malpractice defense did not disqualify lawyer from representing current client in suing former client for medical malpractice).

Dubbed by some as "playbook" information, the heart of this concept is possession of extensive and relevant information about a client obtained directly or as a byproduct of confidential communications, or at least through communications that would not have been made if the client had known that the law firm would be able to use the information against the client in later litigation. Subsequent use of that information could thus give the law firm an unfair advantage over the former client based in no small part on exploitation of these fruits of confidential communications. *See, e.g.*, RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL ETHICS — THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 1.9-1(b)(3) (2005); HAZARD & HODES, *supra* § 13.7.

The concept of "playbook" disqualification has been rightly condemned unless there is a "showing of substantial relationship based on confidentiality concerns [which] is equivocal . . . ." Charles W. Wolfram, *Former-Client Conflicts*, 10 GEO. J. LEGAL ETHICS 677, 727 (1997). Even then, "significant playbook considerations play an important, but limited, tie-breaker role." *Id.*[15] As

---

competitors." *Maritrans*, 529 Pa. at 250, 602 A.2d at 1281.

[15]As noted in the commentary to the American Bar Association's Model Rules of Professional Responsibility,
> "[i]n the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation. A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the

15

a result, to the extent that any doubt remains regarding the existence of a substantial relationship between Gordon & Silver's prior representation of NADC and this case, the presence of such "playbook" information confirms that a substantial relationship exists. *See, e.g.*, Wolfram, *supra*, at 727.

### V. IS THE REPRESENTATION "MATERIALLY ADVERSE?"

Disqualification, however, follows only if the interests of Gordon & Silver's current client are "materially adverse" to NADC. Given the posture of the litigation, this requirement is easily met; as set forth above, there is a substantial relationship between the two representations, which gives rise to a presumption that Gordon & Silver possesses confidential information, the use of which could disadvantage NADC. The court thus reluctantly must grant NADC's disqualification motion. As noted by the Ninth Circuit in *Chugach*, "Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, given way in cases of doubt." *Chugach*, 370 F.2d at 444.

### VI. CONCLUSION

Gordon & Silver represented NADC during its formative stages. During that time, it gave advice on litigation NADC claims will be a point of inquiry in the present case against Joseph and MacDonald. That alone would be sufficient to establish that the relationship between the present lawsuit and the former representation is "substantially related," one of the requirements for the present disqualification motion. In addition, however, Gordon & Silver retains either the actual communications or the essence of confidential communications generated by professionals previously affiliated with Gordon & Silver on matters that are also substantially related to the

---

subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.

Comment 3, Rule 1.9, AMERICAN BAR ASS'N, ANNOTATED MODEL RULES OF PROFESSIONAL RESPONSIBILITY (2003).

current lawsuit. When added to the pervasive scope of the initial representation, this also provides grounds for disqualification when, as here, the current interests of the litigants are materially adverse.

For the reasons stated above, the court grants NADC's motion to disqualify Gordon & Silver. A separate order meeting the requirements of Rule 9021 of the FEDERAL RULES OF BANKRUPTCY PROCEDURE will be separately entered.

Copies sent to:

Brett A. Axelrod, Esq.,

Gerald M. Gordon, Esq.

Zachariah Larson, Esq.

# # #